**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| KEITH KUZELKA, individually and derivatively on behalf of K4 Manufacturing Group LLC, an Illinois limited liability company, <br><br>     Plaintiff, <br> v. <br><br> DORA KUZELKA, KATHY CATALANO, KARI KUZELKA, KENNETH KUZELKA and KSO METALFAB, INC. <br><br><br>     Defendants. | Case No.: _____ |

**COMPLAINT FOR
<u>RETALIATORY DISCHARGE, DECLARATORY RELIEF AND ACCOUNTING</u>**

Keith Kuzelka ("Keith"), individually and derivatively on behalf of K4 Manufacturing Group LLC ("K4"), an Illinois limited liability company, by his undersigned attorneys, for his Complaint against Dora Kuzelka ("Dora"), KSO Metalfab, Inc. ("KSO"), Kathy Catalano ("Kathy"), Kari Kuzelka ("Kari") and Kenneth Kuzelka ("Ken") states:

**I.      Introduction**

1.      Keith is an owner of a twenty-five (25) percent interest in K4 and a former employee and minority shareholder of KSO. He has been frozen out of both KSO and K4. This freeze-out is the result of corporate oppression by his mother, Dora, the majority shareholder and President of KSO; and his siblings, Kathy, Kari and Ken, who each own a twenty-five (25) percent interest in K4 and are minority shareholders of KSO. Dora has operated KSO for her own benefit and in breach of her fiduciary duties. Kathy, Kari and Ken are dominated by Dora and have

participated in and aided and abetted the oppression of Keith, and have breached their fiduciary duties of loyalty and care owed to K4 and to Keith.

2. Beginning in 2016, Keith was diagnosed and received treatment for stage four head and neck cancer, including removal of a substantial portion of his neck and tongue, radiation and chemotherapy. Starting in 2016, Keith began cancer treatment at the Mayo Clinic and worked remotely for KSO as needed and as his health allowed. Each time Keith returned from the Mayo Clinic, Dora complained of the cost of Keith's cancer treatment. Keith was a key member in the operations of KSO and K4 until Dora and KSO fired him from KSO on September 19, 2018 under police escort and surveillance.

3. Keith was discharged by KSO and Dora in violation of his rights under the Employee Retirement Income Security Act of 1974 ("ERISA"). KSO, when the police came to walk Keith off-site, is located at 250 Roma Jean Parkway, Streamwood, Illinois. K4 owns the property and leases it to KSO.

4. Since Keith's discharge from KSO, Dora, Kathy, Kari, Ken and KSO have denied Keith access to K4's and KSO's records. They have also made unfounded accusations concerning Keith's integrity. In addition, KSO and Dora promised to pay for Keith's cancer treatment but now refuse to do so. By this Complaint, Keith seeks remedies: (1) for violations of ERISA including reinstatement and/or front pay; (2) under Section 12.56 of the Business Corporation Act for Defendants' oppressive and illegal conduct toward Keith, including an accounting as to amounts the Defendants have taken from KSO for their own benefit; (3) a buyout of Keith's KSO shares based on a fair and transparent valuation; and (4) damages for Defendants' efforts to deprive Keith of the fair value of his KSO shares.

5.      Furthermore, Kathy, Kari and Ken have seized substantial sums of money, over $70,000, from K4 for no justifiable business purposes.  Keith seeks an accounting of these funds.

6.      Moreover, Keith, on behalf of K4, seeks injunctive and declaratory relief against Kathy, Kari and Ken declaring that they have breached their fiduciary duties to Keith and K4, ordering them to repay K4 the amounts they improperly took from K4 and allowed KSO to withhold, ordering them to provide an accounting of K4; and ordering them to purchase Keith's interest in K4 at a price that fairly reflects K4's true value.

**A.      Jurisdiction and Venue.**

7.      This Court has subject matter of this case pursuant to 28 U.S.C. §1331, as it arises under the laws of the United States, 29 U.S.C. § 1441.  This Court has supplemental jurisdiction over the remaining claims pursuant to 28 U.S.C. § 1367(a), as they are so related to the federal question claim that they form part of the same case or controversy under Article III of the United States Constitution.

8.      Venue is proper in the United States District Court for the Northern District of Illinois, as the defendants reside in this judicial district and the events giving rise to this lawsuit occurred in this judicial district and the transactions alleged herein occurred in Cook County.

**B.      The Parties.**

9.      KSO is located in Streamwood, Illinois.  It provides vertically integrated precision sheet metal fabrication and machining for its customers.  KSO, through Dora, holds itself out to be a women owned business (WBE) for purposes of government contract preference purposes. Dora is 82 years of age.

10. K4 owns the real estate and building located at 250 Roma Jean Parkway in Streamwood, Illinois (the "Premises"). K4 leases the Premises to KSO. Dora, President and majority shareholder of KSO, and Keith, Kathy, Kari and Ken are minority shareholders. Keith, Ken, Kathy and Kari each own a 25% membership interest in K4. K4 also leases an Amada Acies laser cutting and punching machine (the "Amada machine") to KSO. A copy of the Lease is attached as Exhibit 1.

11. In 2016, K4 purchased the Amada machine at a cost of $1.4 million. K4 borrowed the $1.4 million to purchase the Amada machine from Itasca State Bank. K4 purchased the Amada machine for the exclusive use by KSO. Rather than place a lien on any of KSO assets, the note from Itasca Bank is secured by a mortgage on the Premises and guaranteed by Dora and KSO.

12. As majority shareholder, a director and President of KSO, Dora controls KSO. Since becoming majority shareholder after her husband's death in 2005, Dora has made all significant financial decisions for KSO and K4. Dora operates KSO for her own benefit and for the benefit of favored children and or shareholders and has directed the operations of K4 to benefit KSO and her personal interests rather than those of K4's members.

13. Keith is a resident of Elgin, Illinois and owns a 25 percent interest in K4 and owns 467 shares, or 12.97% of KSO's 3,600 outstanding shares. While Keith was a KSO employee, KSO maintained an employee welfare benefit plan that provided health insurance coverage to KSO employees, including Keith, which was governed by the federal Employee Retirement Income Security Act ("ERISA").

14.     In addition, as of March 24, 2012, Keith's three adult children, Keith Jr., John and Nina, each own 26 KSO shares and Keith's wife, Laura, owns 15 KSO shares. Collectively, Keith's family owns approximately 560 shares or 15.5% of KSO's stock.

15.     Ken is Keith's brother and Dora's son. Ken is a minority shareholder and employee of KSO and owns a twenty-five percent interest in K4.

16.     Kari is Keith's sister and Dora's daughter. Kari is 56 years old and resides with her mother. Kari is a minority shareholder and an officer and director of KSO and owns a twenty-five percent interest in K4.

17.     Kathy is Keith's sister and Dora's daughter. Kathy is a minority shareholder of KSO, owns a twenty-five percent interest in K4, and currently is K4's tax member.

18.     KSO is an Illinois corporation. As of March 24, 2012, all but 77 shares of KSO's outstanding 3,600 shares were owned by Kuzelka family members. At that time, Dora owned 59.1% of KSO's shares.

19.     As of March 24, 2012, Ken owned 525 KSO shares, Kari owned 200 KSO shares and Kathy owned 200 KSO shares. Their current shareholdings are not known.

20.     Dora is KSO's President and Kari is KSO's Secretary. Dora and Kari also are KSO's only directors. Dora makes all significant decisions for KSO without objection from Kari.

21.     David Sugar ("Sugar") is a CPA and a partner of the accounting firm of Weiss, Sugar, Dvorak & Dosek, Ltd. Sugar has been KSO's accountant for more than five years and has

been responsible for reviewing KSO's financial statements and preparing KSO's federal and state tax returns.

22.     Kathy, Kari and Ken each have surrendered their independent business judgment to Dora and defer to Dora in any material decision or issue concerning KSO or K4, even though Dora has no ownership interest in K4.

**II.     Keith's Employment With and Discharge From KSO.**

**A.     Keith Returns KSO to Profitability.**

23.     Keith began working at KSO in or about 1988.  At the time, Keith's father owned KSO.  Keith was involved in sales, marketing and production.

24.     In 1998, Keith moved to Texas and started a business.  Three years later in 2001, Keith sold his business.

25.     In 2005, Keith's father died and Dora took control of KSO.  In 2009, Keith again became employed by KSO.  Keith brought customers to KSO that he had developed while working for other metal fabricating companies.  Dora placed Keith in charge of KSO's sales, marketing and production.

26.     Although KSO was struggling financially when Keith returned to the company in 2009, under Keith's leadership of sales and production, KSO returned to profitability between 2011 and 2017, and on information and belief, 2018.

**B.     Keith Is Diagnosed with Cancer.**

27.     In August 2016**,** Keith was diagnosed with stage four head and neck cancer.  From August 2016 through September 2018, while employed by KSO, Keith received cancer treatment

at the Mayo Clinic in Rochester, Minnesota. While he received treatment, he continued to work for KSO.

28. When Keith was diagnosed with cancer, he remained in charge of sales and marketing for KSO, and worked remotely during the times he was receiving medical treatment at the Mayo Clinic. During this time, KSO continued to be profitable.

29. Keith's medical bills for his cancer treatment included bills for surgery, medications, radiation, chemotherapy and inpatient and outpatient treatment at the Mayo Clinic in Rochester, Minnesota.

30. Keith submitted Mayo Clinic and other medical bills to KSO's group health insurer Blue Cross Blue Shield ("BCBS") for his cancer treatment and related health conditions starting in or about August 2016. Mayo Clinic and Keith's other medical providers billed for Keith's medical treatment on a regular basis.

31. Dora regularly reviewed information on Keith's insurance claims and medical bills. After receiving the information, Dora would regularly ask Keith how much longer his treatment would continue because of the cost and inconvenience to KSO of his treatment.

32. By April 2017, Keith had returned to work at KSO's offices after his cancer treatment at the Mayo Clinic. During a KSO staff meeting held at the Premises at that time, Dora complained about the cost to and the burden on KSO due to Keith's cancer treatment.

33. After April 2017, Keith returned to the Mayo Clinic for follow up treatment and submitted his medical bills to KSO's group health insurer. Dora regularly complained to Keith about the burden and cost that Keith's cancer treatment placed on KSO.

7

34.     While Keith was undergoing cancer treatment, in 2017, Dora told Keith he was no longer in charge of production at KSO.  After this occurred, plant manager Jennifer Casas (aka Yolanda Decasas Robles) advised Keith that the production shop was not functioning properly and asked when Keith would return to run production because she needed his help.  Keith told Ms. Casas that he was no longer in charge of production and she should talk to Keith's brother Ken.

35.     In June 2018, Keith returned to the Mayo Clinic for treatment for a possible recurrence of cancer, again working remotely while he was at the Mayo Clinic. He submitted his medical bills to BCBS.

36.     On September 4 and 6, 2018, Keith again returned to the Mayo Clinic for additional treatment, and as was customary, submitted his medical bills to BCBS.

**C.      Dora Terminates Keith as a KSO Employee and Fails to Honor Her Promise to Pay Medical Expenses.**

37.     Keith returned to work at KSO's offices from the Mayo Clinic in mid-September 2018.

38.     On September 19, 2018, without warning, Dora telephoned Keith and told him he was fired because he had "moved a desk" and because he was exercising too much control over KSO and K4.  These reasons were phony and pretextual, as KSO's and Dora's true reason was to interfere with the cancer treatment Keith, Dora's son, was receiving.

39.     Dora and the Defendants caused the police to be called to escort Keith from the Premises without allowing him to remove any of his personal belongings.

40.     Since September 19, 2018, Keith has been frozen out of KSO's business and operations and denied access to the books and records of the company.  Although Keith has made repeated requests, KSO and Dora have refused to provide Keith the books and records of KSO to which, as a KSO shareholder, he is entitled.

41.     After Keith's discharge, Dora attempted a forced purchase of Keith's KSO shares, based on an unfair, incomplete, and erroneous valuation.

**D.     Dora Promises to Pay Keith's Medical Bills, then Renege for Phony Reasons.**

42.     On the same day Dora terminated Keith as a KSO employee, she sent him a text message which confirmed a promise to pay Keith's future medical bills, and which stated: "Just so you know You [sic] would never be without insurance nor any medical outlay.  The rest will be be [sic] decided after we all sit down without raised voices or Attacks [sic] Just facts."  A copy of this text message is attached as Exhibit 2.

43.     Despite this promise, Dora and KSO have failed to pay for Keith's insurance and medical outlay.

44.     Since the time Dora and KSO terminated Keith on September 19, 2018, the Defendants have engaged in a systematic attack on Keith's character and mounted false accusations to try and justify their actions, such as:

(a)     Keith "manipulated" KSO's new payroll system for the benefit of Keith's and his sons', who worked at KSO and did not allow others access.

**In fact, Dora and Lori Jochheim, KSO's former human resource director, set up KSO's new payroll system.  In addition, Dora, Patti Weberling and Kari each had access to the payroll system and used it, and Dora knew and**

9

approved both Keith's raise and the approximately two dollar an hour raise his sons received.

(b)    Keith and his children had started a silk screening business that competed with KSO, without the knowledge or permission of KSO.

**In fact, this accusation is false. The silk screen work that Keith did was work that KSO had declined because it was unprofitable for KSO;**

(c)    Keith compromised and then misappropriated a receivable from a KSO client, Nippon Sharyo ("Nippon"), without the knowledge or approval of KSO.

**In fact, this accusation is false. Ken, not Keith, negotiated and arranged the Nippon transaction with Dora's knowledge; Ken and Keith each received funds from that transaction with Dora's knowledge and approval; Keith continues to hold a portion of those funds in escrow despite his entitlement thereto; and on information and belief, the Nippon transaction is not reflected in KSO's financial records;**

(d)    Keith diverted KSO business to Fabrifast, a company in which he owns as interest.

**In fact, this accusation is false. Keith has been a passive minority investor owning three percent of Fabrifast stock, since the company started in 2004, before Keith became employed by KSO. Keith has not "diverted" any KSO business to Fabrifast.**

(e)    Keith accessed Mie Trak, one of KSO's software systems, after he was terminated.

**In fact, this accusation is false. KSO's records show that after Keith's termination, the Mie Trak "Administrator," not Keith, accessed Mie Trak, and Dora, Ken and Kari each had Administrator rights.**

(f)    Keith, post-termination, has unfairly solicited KSO customers for an alleged KSO competitor.

**In fact, this accusation is false. Keith has not unfairly competed with KSO since Defendants caused KSO to fire him. Keith is not subject to a restrictive covenant with KSO; Keith brought all KSO customers that he has contacted after his termination to KSO when he began employment with KSO in 2008; Keith has no other way to support his family; Keith has incurred significant medical costs and health insurance premiums that Dora and KSO promised to pay; and KSO has failed to purchase Keith's 12.97 percent ownership based**

on a fair and transparent valuation, in an attempt to exert unlawful control over Keith's activities and efforts to provide for his family.

(g)     Keith stole $60,000 from KSO's safe.

**In fact, this accusation is false.  Keith did not have a key or combination to the KSO safe.  KSO has failed and refused to provide any evidence, documentation or justification for this malicious allegation**.

(h)     Keith removed books and records of K4 and KSO from the Premises when he was

discharged.

**In fact, this accusation is false.  Keith had no prior notice he was being discharged; he was accompanied from the Premises by a Streamwood, Illinois police officer, whose police report does not refer to Keith removing any boxes or documents; and despite Defendants' repeated claims that there were eyewitnesses to Keith's removal of records, Defendants have refused to identify any of these supposed eye witnesses after repeated requests that Defendants do so.**

**III.     Dora's Breaches of Fiduciary Duty to Keith and KSO.**

**A.     KSO Uses K4 to Acquire a $1.4 Million Machine Debt Free and Pays Below Market Rent.**

45.     Beginning with the creation of K4 in 2009, KSO leased the Premises from K4 for its business operations.

46.     During 2013, KSO paid K4, then called 250 Roma Jean Parkway LLC, $15,500 per month for use and occupancy of the Premises.  From 2014 through April 30, 2016, KSO paid K4 $17,000 per month for use and occupancy of the Premises.

47.     From May 2016 through April 30, 2017, KSO paid K4 $18,500 per month for use and occupancy of the Premises.

48.     In or about 2016, KSO determined to purchase an Amada Acies combination punch/laser machine (the "Amada machine").   This sophisticated 33-ton machine cost approximately $1.4 million.

49.     Rather than purchasing the machine directly, Dora caused K4 to borrow $1.4 million from Itasca State Bank ("Itasca"), amortized over 30 years, secured by a mortgage on K4's Premises, requiring K4 to pay Itasca $8907.38 each month for loan.  In so doing, Dora caused K4's premises to be encumbered, whereas before K4 was almost debt free.

50.     K4's monthly payments to Itasca for the loan used to purchase the Amada machine are $8,907.38.  Dora saddled K4 with long-term debt when K4 previously had minimal debt, while benefitting KSO's financial position and operations, all of which inured to Dora's benefit as KSO's majority shareholder.

51.     KSO has exclusively used the Amada machine since K4 purchased it in March 2016.  KSO paid nothing to K4 for the use of the Amada machine from March 2016 through April 30, 2017.  At a minimum, KSO should have paid K4 the monthly Itasca loan payments of $8907.38 for its use of the Amada machine from March 1, 2016 through April 30, 2017 or $124,703.32.

52.     Beginning from May 1, 2017 through April 30, 2018, pursuant to the Lease, KSO paid K4 $21,500 per month in total rent for the Premises and monthly payments for the Amada machine with $9,500 credited to the Amada machine and $12,000 credited for the use and occupancy of the Premises.

53.     Thus, starting May 1, 2017, KSO paid K4 $6500 less in monthly payments for rent of the Premises than it had done from May 2016 through April 30, 2017.

54.     This new lease payment amount reduced KSO's monthly expenses by $6,500.  This reduction was a benefit to Dora, KSO's majority shareholder, and was a detriment to K4 and its members, including Keith.

55.     As a result, KSO owes K4 additional rent of at least $6500 per month for 29 months from April 1, 2017 through August 31, 2019 for a total of $188,500 in additional rent.

56.     The Lease further called for KSO's below market rent to increase from $21,500 to $22,000 effective May 1, 2018 and to $22,500 effective May 1, 2019.  KSO, at Dora's direction, has failed to pay the rent increase.

57.     Since September 2018, after Keith was frozen out of KSO's and K4's operations, KSO has paid only $8907.38 per month to K4, the amount of K4's monthly loan payment to Itasca. Based on the amount of rent due under the Lease, KSO has failed to pay K4 $13,092.62 per month from April 1, 2018 through April 30, 2019 and $13,592.62 for the period of May 1 through August 31, 2019, for a total of an additional $224,574.54 in back rent due K4 from KSO.

58.     While KSO may have written checks that purport to be for use and occupancy of the Premises after September 2018, K4 refuses to cash these checks, on information and belief at Dora's direction.

**B.      Dora Manipulates KSO's Finances.**

59.     Dora caused KSO to issue certain paychecks payable to cash to KSO employees, and failed to deduct payroll taxes from those checks.  On more than one occasion, Patti Weberling, KSO's internal accountant, advised Dora that this practice was inappropriate.  Dora ignored Ms. Weberling's advice.

60.    On information and belief, Dora has caused KSO's accountant to manipulate KSO's balance sheet by improperly decreasing KSO's net worth to devalue Keith's KSO shares.

61.    For example, even though KSO has not signed any long term lease agreement for the Amada machine, KSO's balance sheet as of January 31, 2018 showed a long term liability for machine leases of $1,421,157.68.  On information and belief, KSO has never executed a long term machine Lease with K4 for the Amada machine or any other equipment.  This undocumented liability has caused KSO to understate its net worth.

62.    In or about 2008, Dora, after her husband's death, determined that KSO should become a woman-owned business enterprise ("WBE") or, for United States Department of Transportation projects implemented by States, a Disadvantaged Business Enterprise ("DBE"). Dora did this because of preferences given by certain companies and government agencies to such businesses.  Upon information and belief, Dora off-loaded personal assets to satisfy the WBE financial criteria, with the plan to re-take these assets upon her separation and/or retirement from KSO.

**C.      Dora Fails to Accept a Valuable Offer to Purchase KSO That Would Have Benefitted KSO's Minority Shareholders.**

63.    In or about 2018, KSO received a bona-fide offer to purchase all of its stock.  The total purchase offer was for $5,473,693, which included assumption of $1,318,884 of supposedly existing KSO debt, which in fact was K4's debt to Itasca State Bank.

64.    Had Dora accepted this offer for KSO, it would have netted $4,154,809 to KSO's shareholders, making Keith's 12.97 percent ownership interest in KSO equal to $538,878.73.

65.     The purchase offer included an offer to enter into employment agreements with Ken and Keith for a period of 12 – 18 months.  The purchase offer assumed that Dora, who was 82 years old at the time, would retire at the close of the transaction, and also contemplated part-time consulting arrangements with Dora, Ken and Keith for a period of three years following closing.

66.     The purchase offer did not include a purchase of the K4 building.

67.     Dora rejected this offer.  On information and belief, one of the reasons Dora rejected the purchase offer was because it did not provide for a future employment agreement for Kari, who was not a key employee of KSO at the time, and was performing little or no actual work that benefited KSO.

68.     Had this offer been accepted, KSO shareholders could have received as much $1,520 per share.  In contrast, KSO's accountant, Sugar, has asserted that Keith's shares are worth only $476 per share, which Keith disputes.

**IV.     Keith Is a Key Member of K4.**

69.     On December 19, 2008, Dora quit-claimed the Premises, which she owned either directly or beneficially, to newly formed 250 Roma Jean Parkway, LLC.  This LLC was later renamed as K4.

70.     Each of Dora's four children, Keith, Ken, Kari and Kathy Catalano own a 25% membership interest in K4. In 2008, at the time of the transfer, the Premises was valued at more than $1.5 million.

71. KSO is the sole tenant and operates its business in the Premises pursuant to a series of three year leases.

72. From its inception in 2008 as 250 Roma Jean Parkway LLC until September 19, 2018, Keith was a key member of K4. Keith managed K4's operations, in consultation with Ken and direction from Dora.

73. In 2014, the K4 members each executed an Operating Agreement that designated Keith as tax matters partner. The 2014 Operating Agreement changed the name of 250 Roma Jean Parkway LLC to K4 Manufacturing Group LLC. A copy of the 2014 Operating Agreement is attached as Exhibit 3.

74. K4 engaged accountant Harold Blackburn. K4's tax returns were timely filed through 2017 and were provided to each member, without objection.

75. When Keith was discharged from KSO on September 19, 2018, and escorted from the Premises by Streamwood police, he was forced to leave K4's books and records at the Premises.

76. Since September 19, 2018, Keith has been frozen out of K4's operations and denied its books and records. Despite numerous requests, the three other K4 members have refused to provide Keith with access to K4's books and records.

## V.    Kathy's, Kari's and Ken's Breaches of Fiduciary Duty to Keith and K4.

### A.    Kari and Ken Misappropriate K4 Funds.

77.    After Defendants froze Keith out of K4's operations, on November 21, 2018, Kari and Ken withdrew $64,749.89 from K4's Itasca checking account in the form of a cashiers' check payable to them.  A copy of the November 21, 2018 cashier's check is attached as Exhibit 4.

78.    Kari and Ken did not notify Keith of this self-dealing payment.  Shortly thereafter, several other K4 checks that were written by Kathy, Kari or Ken were returned due to insufficient funds, and K4 incurred service charges and fees as a result.

79.    On February 27, 2019, Kari and Ken withdrew another $7020 from K4's Itasca checking account in the form of a cashiers' check payable to them.  A copy of the February 27, 2019 cashiers' check is attached as Exhibit 5.

80.    Kari and Ken did not notify Keith of this self-dealing payment.  Shortly thereafter, several other K4 checks were returned due to insufficient funds, including a check for Cook County property taxes.

### B.    Kathy, Kari and Ken Fail to Recover Payments K4 Made to or on Behalf of KSO and Dora.

81.    In addition, on information and belief, since September 2018, when Keith was frozen out of K4's operations, KSO separately paid $13,092.62 per month to K4 for KSO's Lease payments from April 1, 2018 through the present, by check, rather than the full amount of $22,000 to $22,500 per month, as required by the Lease.

82.    Kathy, Kari and Ken have caused these checks to be deposited in Ken's personal safe rather than being cashed and deposited in a K4 interest bearing account.

83.     In addition, Kathy, Kari and Ken have allowed KSO, from May 1, 2019 through the present, to short K4 $500 per month from Lease payments due under the Lease.

84.     K4 also has paid miscellaneous expenses of KSO totaling over $120,000, including payments for construction at the Premises requested by KSO, such as a mezzanine at a cost of $26,170, as well as for other equipment and furniture ordered by KSO.  Further, K4 has paid more than $19,000 of Dora's personal expenses, including payments for her personal insurance and vacation condominium in Florida.

85.     Kathy, Kari and Ken have failed to seek recovery of funds K4 paid on behalf of KSO, paid to or for the benefit of Dora, and paid to or for the benefit of Kathy, Kari and Ken.

86.      In addition, Kathy, Kari and Ken have failed to seek recovery of amounts that KSO either failed to pay or underpaid K4.  It is estimated that Defendants owe K4 as much as $493,985.85. An itemization of the amounts Defendants owe K4 is attached as Exhibit 6.

87.     Keith provided Kathy, Kari and Ken with a list of such expenses that K4 paid on behalf of KSO and Dora and requested those three members, who collectively own 75 percent of K4's membership interests, to take action to recover these amounts from KSO and Dora.  They have not taken any such action or indicated that they would do so.

**C.     Kathy Calls a K4 Members' Meeting Without Proper Notice.**

88.     On July 18, 2019, Kathy sent a letter to Kari, Ken and Keith, with copies to their counsel purporting to call a meeting of the members of K4.  A copy of Kathy's July 17, 2019 letter is attached as Exhibit 7.

89.     The meeting notice was deficient under both the Illinois Limited Liability Act and under the Operating Agreement that governed K4.

90.     Kathy's letter contained the following meeting agenda items:

> 6.     A discussion to determine whether or not the LLC should initiate legal action against Keith Kuzelka to obtain reimbursement for payments Keith made from the LLC bank account which were either made to pay for his personal expenses, or were otherwise not made in the best interests of the LLC.

> 7.     A discussion to determine whether or not the LLC should initiate legal action against Keith Kuzelka to have him expelled as a member of the LLC for what appears to be significant and continuing breaches of his fiduciary interests to the LLC.

91.     Keith, through counsel, objected to the notice as deficient. Keith's objections were ignored, and the meeting took place on July 25, 2019, at the office of Kathy's and Kari's counsel.

92.     The agenda for the members' meeting included the items in Kathy's letter calling for legal action to be initiated against Keith to expel him as a member for allegedly using K4's funds for his own benefit and allegedly breaching his fiduciary duty to K4. A copy of the meeting agenda is attached as Exhibit 8.

93.     Kathy's letter and agenda were published to all K4 members, their counsel and to Gary Jacobs (Kari's boyfriend), who attended the meeting as Kari's "proxy". The contents of the letter and the agenda were repeated during the meeting. These statements were false and misleading and defamed Keith's business reputation.

## VI.     Making a Demand on KSO and K4 Would Be Futile.

94.     On July 24 and July 25, 2019, Keith made a demand on Kathy, Kari and Ken, through counsel, for K4 financial records and business information. A copy of demand letters

from Keith's counsel dated July 23 and July 25, 2019 are attached as <u>Exhibits 9 and 10</u> and were included in the record of the July 25, 2019 members' meeting.

95.     As members of K4, Kathy, Kari and Ken each owe fiduciary duties of loyalty, care and candor to their fellow member Keith.

96.     Kathy, Kari and Ken, who together own seventy-five (75) percent of K4's membership interests, have failed to provide the requested information, thereby violating 805 ILCS 180/10-15(a), as well as their fiduciary duties to Keith.

97.     On August 12, 2019, Keith also made a demand on K4 to take action to recover monies owed by Dora and KSO. K4 has failed to take any action.

98.     Making a demand on Keith's siblings and/or K4 to take action against Dora and KSO would be futile, as Kathy, Kari and Ken are dominated by Dora and have publicly aligned with Dora and accused Keith of breaching his fiduciary duties.

## VII.    Dora, Kathy, Kari and Ken Defame Keith.

99.     KSO and Dora have made deliberate, undocumented, false and defamatory allegations against Keith, including an allegation that: (a) he removed $60,000 from KSO's safe; (b) that Keith "manipulated" KSO's payroll system for his own benefit or the benefit of his children; (c) that he deleted files from the computer he returned to KSO after Dora fired him; (d) that he took and failed to return K4's books and records; and (e) that he made unauthorized withdrawals from K4's checking account for his own benefit. These statements are false. Despite repeated requests, KSO has failed to provide any documentation supporting any of these allegations.

100.    Kathy, Kari and Ken have stated that non-family members witnessed Keith removing K4's books and records.  This statement is false.  Despite repeated requests, they have failed to provide any documentation supporting any of these allegations and have flatly refused to identify any of these alleged eyewitnesses.

101.    Kathy, Kari and Ken have also publicly and falsely stated that Keith made improper withdrawals or payments from K4's bank account.  This statement is false.

**VIII.  Keith Has Suffered From Defendants' Acts and Omissions.**

102.    Keith and his family have suffered financially and emotionally, and continue to suffer, from his abrupt, unfair and retaliatory discharge; the Defendants' interference with Keith's health insurance benefits; Dora's, K4's and KSO's failure to honor promises to pay for Keith's medical care; Dora's and KSO's refusal to provide corporate records to which Keith is entitled under the Business Corporation Act; and from the false and defamatory allegations Dora, Kathy, Kari and Ken have levelled at Keith.

**COUNT I**
**RETALIATORY DISCHARGE AND INTERFERANCE WITH KEITH'S ERISA RIGHTS (AGAINST DORA AND KSO)**

103.    Keith realleges paragraphs 1- 102.

104.    Count I arises under Section 510 of the Employees' Retirement Income Security Act ("ERISA"), 29 U.S.C. §1140, which provides in relevant part:

> It shall be unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan... or for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan....

105.     Section 510 assures that employee benefit plan participants and their beneficiaries are not denied their rights under employee benefit plans as a result of actions affecting the employment relationship that permits an employee to participate in an employee benefit plan.

106.     KSO's group health insurance plan is an employee welfare benefit plan under ERISA.

107.     Keith participated in KSO's group health insurance plan.

108.     Pursuant to Keith's participation in KSO's ERISA regulated group health plan, Keith had a right to seek medical treatment and to have KSO's plan pay for his medical treatment according to the terms of the KSO's plan.

109.     Beginning in August 2016, Keith was diagnosed with stage four head and neck cancer.  Keith sought and received medical treatment for his cancer, which his surgeon described as "T2, N2, M0, p16-positive squamous cell carcinoma of the left base of tongue."  Keith had significant treatment including surgery removing portions of Keith's tongue and neck, followed by 41 days of chemoradiation therapy.  A copy of a letter from Keith's surgical oncologist Kathryn M. Van Abel, M.D., describing Keith's diagnosis and treatment is attached as Exhibit 11.

110.     Keith timely submitted his medical bills for such treatment to KSO's group health insurer BCBS.

111.     In or about April 2017, at a KSO internal staff meeting, Dora stated, directing her comment to Keith, "You know how much it costs us to keep you in the hospital?"  At that time, Dora also handed Keith a list of medical expenses that KSO had paid for Keith's cancer treatment.

22

112.    Thereafter, Dora continued to complain to Keith of how much KSO was spending for his cancer treatment and to provide Keith with lists that included KSO's share of Keith's medical expenses.

113.    Dora also repeatedly asked Keith when his treatment for cancer would end and, therefore, when KSO's expenses would end.

114.    Keith sought additional treatment at the Mayo Clinic in February 2018. After Dora received the invoices for KSO's share of Keith's medical expenses, she again complained about Keith's medical bills and demanded to know when Keith's treatment and the expenses would finally end.

115.    In early September 2018, Keith was required to seek further medical treatment at the Mayo Clinic and submitted his medical bills for such treatment to KSO's group health insurer. Dora and KSO were each aware that Keith sought this additional medical treatment in September 2018.

116.    On September 19, 2018, upon Keith's return from the Mayo Clinic, Dora interfered with Keith's ERISA protected rights by discharging Keith as a KSO employee in retaliation for his exercise of his rights to health insurance coverage under KSO's group health insurance plan, and for the purpose of interfering with Keith's right to health insurance coverage under that plan.

117.    At that time, Keith was performing his job duties to the reasonable expectations of his employer, KSO. Keith had not received any negative job performance reviews or any indication from Dora or KSO that KSO had any legitimate concerns about Keith's job performance.

118.    Similarly situated KSO employees who did not submit medical bills to KSO's group health insurance plan for cancer treatment were treated more favorably than Keith.  Also, Kari received health insurance through KSO's group health insurance plan even though she was not a full time employee at KSO.

119.    Dora told Keith he was fired for moving Kari's desk and "having too much control." These reasons were phony and pretextual.

120.    As a result of KSO's unlawful and retaliatory discharge of Keith for his exercise of his rights under ERISA, Keith has been injured, has lost the salary and benefits he could have earned but for KSO's and Dora's ERISA violation, has been frozen out of the operations of KSO, has been required to pay for medical treatment that would have been covered under KSO's group health insurance plan and has suffered emotional distress and suffering.

WHEREFORE, Keith prays that this Court enter judgment in his favor and against Dora and KSO as to Count I, granting Keith injunctive and equitable relief, including reinstatement or alternatively front pay, enjoining KSO from further violations of ERISA and from Keith's ability to obtain the benefits of his shareholder status in KSO, awarding Keith his attorneys' fees and such other and further relief as the Court deems just.

## COUNT II
## PROMISSORY ESTOPPEL BY KEITH AGAINST KSO AND DORA

121.    Keith repeats and incorporates by reference paragraphs 1- 120.

122.    On September 19, 2018, Dora, on her own behalf and as President of KSO, promised Keith, and her son, that she would pay his health insurance and medical costs after his termination as a KSO employee.  *See* Exhibit 2 hereto.  This promise was unambiguous.

123.    Keith reasonably relied on this promise to apply for continuation of healthcare coverage and to continue to seek necessary medical treatment.

124.    KSO and Dora expected Keith to rely on their promise to pay for his continuation of healthcare coverage and medical expenses.

125.    Despite Keith's reasonable reliance on Dora's and KSO's unambiguous promise as described above, Dora and KSO have failed to honor their promise, causing to Keith to pay for his own health insurance coverage and medical expenses, to his detriment.  A copy of a chart showing the amounts Keith was forced to pay caused by the failure of Dora and KSO to honor their promise to pay Keith's health insurance premiums and medical expenses, which total $36,413, is attached as Exhibit 12.

WHEREFORE, Keith prays that this Court enter judgment in his favor and against Dora and KSO as to Count II, awarding Keith damages for promissory estoppel in an amount of at least $36,413, and granting Keith such other and further relief as the Court deems just.

## COUNT III
## KEITH'S BREACH OF FIDUCIARY DUTY CLAIM AGAINST DORA AND KARI

126.    Keith repeats and incorporates by reference paragraphs 1-125.

127.    Keith brings this count pursuant to Sections 12.56(a)(3) and (4) of the Illinois Business Corporation Act, 805 ILCS 5/12.56(a)(3) and (4), against Dora and Kari, the sole directors and officers of KSO.

128.    As KSO's sole directors and officers, Dora and Kari owe fiduciary duties of loyalty, candor and care to KSO and to KSO's minority shareholders, including Keith.

25

129.    Making a demand on KSO would be futile.  KSO has refused to honor Keith's request for corporate books and records and has presented an unsubstantiated "low-ball" valuation of Keith's shares in KSO on a take-it-or-leave-it basis.

130.    Making a demand on Dora and KSO would also be futile as KSO has filed a lawsuit in the Circuit Court of Cook County falsely alleging that Keith breached his fiduciary duty to KSO by withdrawing funds from KSO that Dora authorized Ken and Keith to withdraw, while ignoring that Ken did the same.  Conspicuously, KSO's complaint filed against Keith omits any reference to Ken sharing a portion of the authorized withdrawal.

131.    Dora and Kari have breached their fiduciary duties to Keith as a shareholder of KSO and to KSO and have acted in an oppressive and illegal manner toward Keith and KSO by: (a) failing to provide Keith corporate books and records of KSO that, as a shareholder of an Illinois corporation, he has the right to inspect; (b) by failing to accept a bona-fide purchase offer that would have benefitted KSO, Keith and the other KSO minority shareholders; (c) causing KSO's balance sheet to be manipulated so as to improperly devalue Keith's shares in an attempt to force Keith to sell his shares for less than fair value, thereby benefitting Dora, Kathy, Kari and Ken once Keith was removed as a shareholder; (d) misapplying and wasting KSO's assets by using corporate assets for their personal benefit; (e) discharging Keith as a KSO employee in retaliation for his seeking medical treatment for cancer, in violation of Section 510 of ERISA; (f) paying personal expenses for Dora, Kari and Ken, using KSO funds; and (g ) paying Kari a salary in excess of $50,000  annually when she does no meaningful work for KSO and enlisting Kari as a participant in KSO's group health insurance plan when, on information and belief, she did not work sufficient hours to qualify as a participant.

132.     Dora and Kari had no legitimate business justification for their self-interested and self-dealing actions and omissions described above.

133.     As a result of Dora and Kari's breaches of fiduciary duty, KSO and Keith has been damaged.

WHEREFORE, Keith prays that this Court enter judgment in his favor and against Dora and Kari as to Count III for breach of her fiduciary duties, and order any of the relief available under 805 ILCS 5/12.56(b), including without limitation: (a) award Keith and KSO damages in an amount to be proved at trial plus punitive damages for Dora's and Kari's willful and malicious breaches of fiduciary duty; (b) order Dora and Kari to cause KSO to provide Keith with KSO's financial books and records for his inspection; (c) order an accounting by an independent accountant of KSO's finances; (d) remove Dora and Kari as KSO directors; (e) order the purchase of Keith's shares by KSO for their fair value as defined in 805 ILCS 5/12.56(e); and (f) award Keith his attorneys' fees and such other and further relief as the Court deems just and proper.

**COUNT IV**
**AIDING AND ABETTING DORA'S BREACH OF FIDUCIARY DUTY AGAINST KATHY, KARI AND KEN**

134.     Keith repeats and incorporates by reference paragraphs 1-133.

135.     Dora and Kari have breached their fiduciary duties to Keith as alleged in Count III.

136.     Kathy and Ken each aided and abetted Dora's breaches of fiduciary duty by surrendering their independent business judgment to Dora; acquiescing in Dora's corporate freeze out of Keith as alleged above; and allowing Dora to manipulate KSO's balance sheet to obtain Keith's shares at an unfairly low price, with the understanding that they would benefit once Keith had been removed as a shareholder.

WHEREFORE, Keith prays that this Court enter judgment in its favor and against Kathy and Ken as to Count IV, awarding Keith damages in an amount to be proved at trial, his attorneys' fees and such other and further relief as the Court deems just.

## COUNT V
### UNJUST ENRICHMENT DERIVATIVELY BY KEITH ON BEHALF OF K4 AGAINST KSO

137. Keith repeats and incorporates by reference paragraphs 1-136.

138. During 2013, KSO paid K4, then called 250 Roma Jean Parkway LLC, $15,500 per month for use and occupancy of the Premises. From 2014 through April 30, 2016, KSO paid K4 $17,000 per month for use and occupancy of the Premises. From May 2016 through April 30, 2017, KSO paid K4 $18,500 per month for use and occupancy of the Premises.

139. Beginning in March 2016 through April 2017, KSO exclusively used the Amada machine.

140. Beginning May 1, 2017, KSO paid K4 less than fair market rent, by reducing the amount it paid for use and occupancy of the Premises.

141. As a direct result of KSO's payment of less than fair market value rent and its failure to make any Lease payments on the Amada machine from March 2016 through April 2017, KSO has been unjustly enriched at the expense of K4, in an amount in excess of $200,000.

WHEREFORE, Keith, on behalf of K4, prays that this Court enter judgment in its favor and against KSO as to Count V, award K4 damages for unjust enrichment in an amount in excess of $200,000, plus pre-and post-judgment interest thereon, and such other and further relief as the Court deems just.

## COUNT VI
## BREACH OF FIDUCIARY DUTY DERIVATIVELY ON BEHALF OF K4 AGAINST KATHY, KARI AND KEN

142.    Keith repeats and incorporates by reference paragraphs 1-141.

143.    As members of K4, Kathy, Kari and Ken each owe K4 and Keith, as a minority member, the fiduciary duties of loyalty, care, good faith and candor and each has a duty to exercise the highest degree of honesty and good faith in dealing with K4's assets.

144.    Kathy, Kari and Ken each have breached their fiduciary duty to K4 and Keith by: (a) withdrawing and allowing the withdrawal of more than $60,000 from K4's bank account in Kari's and Ken's name, leading to returned checks and bank fees and charges; (b) allowing KSO to withhold  substantial sums in Lease payments; (c) by holding KSO checks without cashing them; (d) failing to demand payment from KSO; and (e) failing to demand the return of or taking steps to recover more than $ 120,000 that K4 paid on behalf of KSO and more than $ 19,000 that K4 paid on behalf of Dora in addition to underpaid and unpaid rent.

145.    Kathy, Kari and Ken have no legitimate business justification for their actions and omissions described in this Complaint, which have harmed and continue to harm K4.

146.    By placing their interests and those of Dora and KSO above those of Keith and K4, without any reasonable business justification and without exercising any reasonable business judgment, Kathy, Kari and Ken have breached their fiduciary duties to K4.

147.    As a direct and proximate result of Kathy's, Kari's and Ken's breaches of fiduciary duty as described above, K4 has been damaged.

WHEREFORE, Keith, on behalf of K4, prays that this Court enter judgment in its favor and against Kathy, Kari and Ken as to Count VI, and order the following relief:  (a) declare that Kathy, Kari and Ken have breached their fiduciary duties to K4; (b) order an independent accounting at the expense of Kathy, Kari and Ken as to K4's finances;  (c) order that Kari and Ken repay monies to K4 that they wrongfully withdrew from K4's bank account; (d) order Kathy, Kari and Ken, jointly and severally, to repay to K4 the amounts they allowed KSO to withhold from rent payments; (e) order a constructive trust in favor of K4 for all monies that are due and owing K4 from KSO and Dora, which Kathy, Kari and Ken have failed to recover; (f) award Keith his attorneys' fees and expenses pursuant to 805 ILCS 180/40-15; and (g) that this Court award K4 such other and further relief as it deems just and proper.

## COUNT VII
## BREACH OF FIDUCIARY DUTY BY KEITH INDIVIDUALLY AGAINST KATHY, KARI AND KEN

148.    Keith repeats and incorporates by reference paragraphs 1-147.

149.    By freezing Keith out of K4's operations, by failing to provide him with requested records and information concerning K4 and by making and publishing false and defamatory statements concerning Keith's business reputation, Kathy, Kari and Ken have breached their fiduciary duties to Keith, and have caused him to be damaged.

WHEREFORE, Keith prays that this Court enter judgment in its favor and against Kathy, Kari and Ken as to Count VII for breach of their fiduciary duties, and order the following relief: (a) award Keith damages in an amount to be proved at trial plus punitive damages for Kathy's, Kari's and Ken's willful breaches of fiduciary duty; (b) order an independent appraisal of K4 and further order Kathy, Kari and Ken to purchase Keith's twenty-five percent interest in K4 at a fair

price based on the independent appraisal; and (c) award Keith such other and further relief as it deems just and proper.

## COUNT VIII
## ACCOUNTING BY KEITH AGAINST K4

150.    Keith repeats and incorporates by reference paragraphs 1- 149.

151.    A fiduciary relationship exists between Keith and K4 and Keith and K4's other three members, Kathy, Kari and Ken.

152.    The finances of K4 are complex, due to K4's interaction with KSO.  An accounting is needed to determine including but not limited to whether K4 continues to have title to the Amada machine in light of accounting entries by both K4 and KSO, whether K4 has an income stream from KSO for KSO's use of the Amada machine and for how what period of time and whether K4 may include the Amada machine as an asset on its balance sheet

153.    In addition, as a result of Keith's lack of knowledge of all of K4's business transactions and records since September 2018, Ken's and Kari's withdrawal of over $70,000 from K4's bank account and the absence of any bank records of full Lease payments to K4 from KSO, Keith is also entitled to an accounting from K4.

WHEREFORE, Keith prays that this Court enter judgment in his favor and against K4 as to Count VIII, order an independent accounting of K4's finances and grant such other and further relief as the Court deems just.

## COUNT IX
## DEFAMATION BY KEITH AGAINST DORA, KATHY, KARI AND KEN

154.    Keith repeats and incorporates by reference paragraphs 1-153.

155.    Dora, Kathy, Kari and Ken have made intentionally made unsubstantiated, false and defamatory public statements concerning Keith that were intended to damage his business and professional reputation.

156.    These false statements include, but are not limited to, allegations (a) that Keith intentionally deleted files from the computer he returned to the Premises after Dora fired him;  and (b) that Keith took and failed to return K4's books and records, while knowing that police escorted Keith from the Premises; (c) that Keith took $60,000 from a KSO safe without permission; (d) that Keith made improper withdrawals or payments from K4's bank account, which in fact were directed or approved by Dora.

157.    Kathy, Kari and Ken have also stated on multiple occasions that non-family members witnessed Keith removing K4's books and records from the Premises.  Despite repeated requests, Kathy, Kari and Ken have failed to provide any documentation supporting these allegations and have refused to identify any of these alleged eyewitnesses.

158.    As a direct and proximate result of Dora's, Kathy's, Kari's and Ken's *per se* false and defamatory statements concerning Keith's business reputation, Keith has been damaged.

159.    Keith demands a trial by jury as to Count VIII.

WHEREFORE, Keith prays that his Court enter judgment in his favor and against Dora, Kathy, Kari and Ken as to Count IX, awarding Keith presumed and actual damages, punitive damages and such other and further relief as the Court deems just.

Dated:  September 26 , 2019          Respectfully Submitted,

                                   KEITH KUZELKA,

                                   /s/ Cary E. Donham
                                   By:  One of Its Attorneys

Cary E. Donham
cdonham@taftlaw.com
John F. Kennedy
Jkennedy@taftlaw.com
TAFT STETTINIUS & HOLLISTER LLP
111 E. Wacker Drive, Suite 2800
Chicago, Illinois 60601
312.527.4000 / Firm I.D. No. 29143

25669773.12